# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 11, 2012

## STATE OF TENNESSEE v. CALVIN TAYLOR

**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2189     J. Randall Wyatt, Jr., Judge**

---

**No. M2010-02122-CCA-R3-CD - Filed December 7, 2012**

---

The defendant, Calvin Taylor, appeals his Davidson County Criminal Court jury convictions of first degree murder, attempted first degree murder, attempted especially aggravated robbery, and attempted aggravated robbery, challenging the sufficiency of the convicting evidence and the sentence imposed by the trial court. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Ashley Preston (on appeal), and Joy S. Kimbrough (at trial), Nashville, Tennessee, for the appellant, Calvin Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Amy Eisenbeck and Robert Homlar, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant's convictions relate to events that transpired outside the Millennium Apartments in Nashville on April 5, 2008. On that date, the defendant and Antonio Graham were socializing with 17-year-old Allaric Buckner and 15-year-old Raymond Polk near Pot's Market when they decided to travel to the Millennium Apartments to obtain marijuana. Once at the apartments, the defendant drew a gun on the two juveniles and ordered Mr. Graham to search their pockets. When the search proved fruitless, the defendant attempted to shoot Mr. Polk in the face, but the gun misfired. Mr. Polk ran away. Mr. Buckner, however, was not so fortunate. The defendant fired a single shot into Mr.

Buckner's face, killing him.

At trial, Ruby Byrd testified that she traveled to the Millennium Apartments on April 5, 2008, to meet some friends. When she arrived, she "saw three dudes proceed to the side of the" building and then heard a single gunshot. She jumped from her vehicle and started running. As she ran, she encountered a nearly naked young man being chased by "another guy in a black hoodie and a bandana . . . firing a weapon." One of the bullets struck Ms. Byrd's vehicle.

Kendra Ransom, a residence of the Millennium Apartments, testified that she was at home with her daughters when she heard gunshots coming first from the sidewalk area in front of the apartment followed by more "shots fired to the right of the building." When she looked into the courtyard after the shots were fired, she saw two young men, and "one was holding the other saying, it's going to be okay, man, it's going to be okay." Neither man was wearing a shirt. She closed the door. When she opened the door again a short time later, she saw a man lying in the courtyard surrounded by onlookers.

Metrelle Burton, another resident of the Millennium Apartments, testified that on April 5, 2008, she was preparing to go out with friends when she "heard a lot of commotion" that prompted her to go onto her balcony and look down. As she looked out, she heard someone say, "Take off your clothes," and another respond, "I'm not going to." She said that she saw a gun but "didn't pay no attention to it" and returned inside. When she heard gunshots, she returned outside, where she saw "a body laying on the ground." Ms. Burton recalled that all of the men, the one with the gun and the three without, removed their clothing, and that one man returned to get his clothes after the shooting.

Metropolitan Nashville Police Department ("Metro") Officer Byron Boelter testified that he responded to a call of shots fired at the Millennium Apartments and that when he arrived, he "saw a young man, probably about [16] years old, [17] years old, a teenager. He had on a tank top and he was nude from the waist down. And he was lying on his back in the middle of the courtyard. He appeared to be . . . deceased."

Metro Officer Matthew Grindstaff also responded to the call at the Millennium Apartments, and when he arrived, he observed "two male blacks and they weren't wearing shirts." The men directed him to the victim's body. In the courtyard, he observed the deceased victim. He did not see the men again.

Antonio Deshaon Graham, who described himself as a lifelong friend of the defendant, testified that on April 5, 2008, he "pulled over" on Seifried Street to "holler at" the defendant, and the defendant told him that "he had two home boys at the store, they had

a blunt. They didn't have no cigar. So [he and the defendant] went over to the store to see how it was." Mr. Graham said that he and the "two home boys," one of whom was named Raymond, purchased a cigar and then "smoked a bundle . . . and started chilling." When they "ran out of weed," all four went to the nearby apartment complex to buy some more. At that point, the defendant "told the two other guys . . . he pulled a gun out on 'em and told them to get naked." Mr. Graham said that the defendant ordered him to search the young men, and he complied but found nothing. Mr. Graham described what happened next: "[The defendant] put the gun up to the guy's face and clicked once and it didn't go off. And he cocked it back. . . . That's when he shot and I ran, I ran to my car." Mr. Graham recalled that the defendant shot the man who was not named Raymond.

During cross-examination, Mr. Graham admitted that he waited for the defendant by the car after the shooting.

Metro Officer Michelle Hammond, who was "second or third up to the victim," testified that the young man was lying on his back, unresponsive, and nude from the waist down. He "had a small wound to the lower left side of his nose." Officer Hammond followed the ambulance to the hospital, where the shooting victim was pronounced dead at 12:25 a.m.

Metro Detective Cody O'Quinn testified that he was the lead investigator into the homicide of Allaric Buckner and the attempted homicide of Raymond Polk. He interviewed both Mr. Polk and Mr. Graham following the shooting, and Mr. Graham identified the defendant as the shooter.

Assistant Medical Examiner Adele Lewis, who performed the autopsy of Mr. Buckner, testified that the cause of Mr. Buckner's death "was a gunshot wound to the head." The bullet entered his head right next to his nose, traveled downward, went into "his mouth and passed through his neck and exited the right side of his neck." She said that the presence of stippling indicated "an intermediate range gunshot wound," meaning that it was fired from a distance of six to 18 inches. Doctor Lewis testified that Mr. Buckner was five feet, six inches tall, weighed 115 pounds, and was 17 years old at the time of his death.

Sixteen-year-old Raymond Polk testified that on April 5, 2008, he was hanging out with Mr. Buckner smoking marijuana. At some point, he and Mr. Buckner took a bus to the area of town near the Millennium Apartments and met the defendant and Mr. Graham. He said that all four of them smoked marijuana inside Mr. Graham's car. They got out of the car and walked to a nearby market and then to the apartments. Mr. Polk said that when they arrived at the apartment complex, the defendant said, "[Y]'all come on with everything." He said that he understood this to mean that they were being robbed. Mr. Polk testified that the

-3-

defendant insisted that they had marijuana and ordered Mr. Graham to search them. When Mr. Graham found nothing, the defendant told Mr. Polk and Mr. Buckner to strip. After Mr. Polk had removed his clothes, the defendant "tried to shoot [him], but the gun didn't go off." He described what happened next: "Then he cocked his gun back and put one in the chamber real quick, then he shot Alec." At that point, Mr. Polk, still naked, ran, and the defendant followed, shooting at him. Mr. Polk said that he ran up Seifried Street and "turned right . . . and . . . cut back through the church" to the Millennium Apartments so that he could check on Mr. Buckner. When he saw Mr. Buckner lying dead in the courtyard, he picked up some pants, and a woman came outside and convinced him to come into her apartment.

Eventually, the police arrived and took him to the station for questioning. He said that he "[s]omewhat" told the detectives what had happened but that he did not tell them that the defendant was the perpetrator because he "didn't want them to handle it." Later, however, he told police that Mr. Graham had been involved and identified the defendant from a photograph array.

At the conclusion of this testimony, the State rested, and the defendant declined to present any evidence. On the basis of the evidence presented by the State, the jury convicted the defendant of one count of first degree premeditated murder, one count of felony murder, one count of attempted first degree murder, one count of attempted especially aggravated robbery, and one count of attempted aggravated robbery.

The trial court merged the convictions of first degree murder and imposed a sentence of life imprisonment. Following a sentencing hearing, the trial court imposed sentences of eight years for the defendant's convictions of attempted first degree murder and attempted especially aggravated robbery and a sentence of three years for the defendant's conviction of attempted aggravated robbery. The trial court ordered partially consecutive service of the sentences based upon its finding that the defendant had no regard for human life and that the defendant was on probation at the time of the offenses. The total effective sentence is, therefore, life plus eight years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence and the sentence imposed by the trial court.

*Recusal*

During our review of the appellate record in this case, this court discovered a March 31, 2009 order drawn by Judge Wyatt recusing himself from the defendant's case "for good cause shown" and transferring the case to another division of the Davidson County

-4-

Criminal Court. No further explanation was provided for the recusal order. Despite the order, the next pleading in the record, and every other pleading thereafter, was filed in Judge Wyatt's court and ruled upon by Judge Wyatt. Judge Wyatt then presided over the defendant's trial, sentencing, and motion for new trial. Observing that a determination that Judge Wyatt was prohibited from presiding over the defendant's trial after having recused himself would automatically result in the defendant's being granted a new trial, we ordered the parties to address this issue.

The State filed a responsive brief, noting that no motion seeking Judge Wyatt's recusal appeared in the record, that the recusal order did not state the grounds for recusal, and that neither party objected to Judge Wyatt's resuming control of the case. The State also moved this court to supplement the record with an order drawn by Judge Fishburn transferring the case back to Judge Wyatt's court. We granted the State's request. The April 29, 2009 order simply transfers the case from Judge Fishburn's court into Judge Wyatt's court without explanation. The State argues that because the reasons for the original recusal are not apparent from the record, because Judge Fishburn saw fit to return the case to Judge Wyatt, because neither party objected to the transfer, and because the defendant did not raise the issue on appeal, this court must presume that Judge Fishburn's decision to transfer the case and Judge Wyatt's decision to remain on it were correct. The State also argues that the defendant has waived any claim related to Judge Wyatt's recusal by failing to file a response to this court's order.

"'The right to a fair trial before an impartial tribunal is a fundamental constitutional right.'" *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008) (quoting *State v. Reid*, 213 S.W.3d 792, 815 (Tenn. 2006) (citation and internal quotation marks omitted)). That being said, "[a]s a matter of custom and law, recusal decisions are made by the trial judge himself or herself." *State v. Hester*, 324 S.W.3d 1, 72-73 (Tenn. 2010) (citing *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 239-40 (Tenn. 2010); *Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009)). Unless the recusal is based upon one of the grounds listed in Article VI, Section 11 of the Tennessee Constitution or Tennessee Code Annotated section 17-2-101, the decision lies within the sound discretion of the trial judge. *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998).

Here, no motion seeking Judge Wyatt's recusal appears in the record, and Judge Wyatt's order recusing himself does not list the grounds for recusal. Nothing in the record suggests that Judge Wyatt's recusal was mandated by the constitution or the Code. That Judge Fishburn reassigned the case to Judge Wyatt militates against a finding that Judge Wyatt's earlier recusal was mandatory, as do the facts that neither party objected to Judge Wyatt's resuming control of the case and that the defendant did not even address the recusal issue when ordered to do so by this court. Moreover, the defendant's failure to object at trial

and failure to address the issue on appeal operates as a waiver of any claim to relief. The defendant is not entitled to relief on this issue.

*Sufficiency*

The defendant challenges the sufficiency of the convicting evidence for each of his convictions. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Because the defendant's only claim regards the credibility of the witnesses for the State, we need not belabor our analysis. Mr. Graham testified that he and the defendant picked up Mr. Polk and another young man and that the four of them smoked marijuana before walking to the Millennium Apartments. Once at the apartments, the defendant pulled a gun, ordered Mr. Graham to search the men, and, when the search proved fruitless, the defendant ordered the young men to remove their clothes. He then attempted to shoot Mr. Polk and succeeded in shooting Mr. Buckner. Mr. Polk confirmed that he smoked marijuana with the defendant, Mr. Buckner, and Mr. Graham before the four of them walked to the Millennium Apartments. In the courtyard of the apartment complex, the defendant attempted to rob Mr. Buckner and Mr. Polk with the assistance of Mr. Graham[1] and then attempted to shoot Mr. Polk. After the gun misfired, the defendant succeeded in shooting Mr. Buckner. Although the defendant contends that the testimony of Mr. Graham and Mr. Polk was "wholly inconsistent" and that both men "had ample reason to lie," the credibility of the witnesses is beyond the purview of this court. That decision is the prerogative of the jury,

---

[1]Although the evidence supports an inference that Mr. Graham was an accomplice in the offenses, the defendant specifically and vehemently rejected a jury instruction on accomplice testimony.

which obviously chose to accredit the testimony recited above. That testimony supports the defendant's convictions.

*Sentencing*

The defendant also challenges the trial court's imposition of partially consecutive sentencing, arguing that consecutive service of the sentences "is excessive and not the least severe measure to achieve the purposes for which the trial court imposed its sentences." The defendant concedes that he met the criteria for consecutive sentencing under Tennessee Code Annotated section 40-35-115.

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Code section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences:
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of

the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Here, the trial court concluded that the defendant fit into the fourth category, that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: (1) the court must find consecutive sentences are reasonably related to the severity of the offenses committed and (2) that consecutive sentences are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see also State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

Here, the trial court rested its decision to impose consecutive sentences on its findings that the defendant had no regard for human life and that the defendant was on probation at the time he committed the offenses in this case. Although the trial court erred by utilizing the dangerous offender classification without making the additional findings required by *Wilkerson*, the record nevertheless supports the imposition of consecutive sentences because the defendant was on probation at the time of the offenses.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE